# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

MICHAEL D. and SHARRON MAYO,     )
individually and on behalf of all those     )
similarly situated,     )
          )
     Plaintiffs,     )
          )
v.     )     No. 08-00568-CV-W-DGK
          )
GMAC MORTGAGE, LLC,     )
USB REAL ESTATE SECURITIES, INC.,     )
DEUTSCHE BANK NATIONAL TRUST     )
COMPANY (in its capacity as trustee of     )
the MASTR SPECIALIZED LOAN     )
TRUST 2007-01), and     )
RESIDENTIAL FUNDING COMPANY, LLC     )
          )
     Defendants.     )

## SUMMARY JUDGMENT ORDER

This case is a putative class action brought under the Missouri Second Mortgage Loan Act ("MSMLA"). Plaintiffs Michael and Sharron Mayo allege they were charged illegal fees at closing in connection with their residential second mortgage loan, and they are suing the various companies who subsequently acquired or serviced their loan.

Before the Court are the Defendants' various motions for summary judgment.[1] The motions are GRANTED IN PART. The Court holds (1) Mrs. Mayo was not a party to the Loan thus she does not have standing to sue Defendants; (2) the funding fee and underwriting fee charged at closing both violate the MSMLA, but the other fees charged do not; (3) the loan servicers did not violate the

---

[1] Motion for Summary Judgment by Deutsche Bank National Trust Company in its capacity as Trustee for the MASTR Specialized Loan Trust 2007-01 (doc. 173); Motion for Summary Judgment by GMAC Mortgage, LLC and Residential Funding Company, LLC (doc. 174); and Motion for Summary Judgment of UBS Real Estate Securities, Inc. (doc. 177).

MSMLA, but Assignee Defendants indirectly violated it by virtue of the fact that illegal fees were rolled into the principal of the Loan at closing, and Assignee Defendants subsequently received these fees in monthly payments; (4) Mr. Mayo may sue for interest previously paid to the Assignee Defendants; and (5) Defendants are not entitled to summary judgment on the issue of punitive damages.

All claims against Defendants GMAC Mortgage, LLC and Residential Funding Company, LLC are dismissed with prejudice.

### Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp*., 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. But the nonmoving party "cannot create sham issues of fact in an effort to defeat summary

judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).

## Facts

Viewing the evidence in the light most favorable to the Plaintiffs, for purposes of resolving the pending motion the Court finds the facts to be as follows. Argument, controverted facts, facts immaterial to the resolution of the pending motion, facts not properly supported by the cited portion of the record, and contested legal conclusions have been omitted.

Plaintiffs Michael and Sharron Mayo are a husband and wife who reside at a house in Grandview, Missouri. They bought their home on October 28, 2005 for $130,000.00. To finance the purchase Mr. Mayo applied for a loan with Wells Fargo Bank, N.A. The Mayos thought that there would simply be one loan from Wells Fargo, but when they arrived at the closing on October 28, 2005, they were told Wells Fargo was not lending the entire purchase price. Wells Fargo would lend $104,000 (80% of the loan), and Option One Mortgage Corporation would lend the remaining $25,800 (20% of the loan).

Mr. Mayo signed two separate loan applications, both dated October 28, 2005. For each loan there was a separate loan underwriting and approval process; separate verification of income and employment; separate wire transfers; separate loan submissions; separate instructions to the closing agent; separate credit checks; and separate title insurance policies. Mr. Mayo also gave Wells Fargo formal notice as the first lien holder that he had given Option One a junior mortgage in the property.

The Wells Fargo loan had an adjustable rate note. The deed of trust for this loan identifies both Mr. and Mrs. Mayo as the "Borrower." Mr. and Mrs. Mayo each signed the deed of trust, but Mrs. Mayo is identified as a "Non-Borrower" on the page bearing the notary's signature. Included

with the deed of trust was an "Adjustable Rate Rider" and a "Prepayment Rider," each of which is signed by Mr. and Mrs. Mayo.

**The Loan at issue in this case.**

The second mortgage loan made by Option One ("the Option One loan" or "the Loan"), is at the center of this lawsuit. The Loan was secured by a subordinate lien deed of trust. The Loan was to be repaid with interest at yearly rate of 11.65% in consecutive monthly installments over 30 years. The promissory note identifies Option One as the lender. The promissory note and addendum are signed by Mr. Mayo only. The HUD-1 Settlement Statement is signed by both Mr. and Mrs. Mayo.

Both Mr. and Mrs. Mayo executed a Deed of Trust for the benefit of Option One. The Deed of Trust identifies "Michael and Sharron Mayo, husband and wife as joint tenants" as the "Grantor," and is signed by both. The Deed of Trust granted Option One a security lien in residential real estate which real estate was subject to one or more prior mortgage loans, namely, the Wells Fargo loan. The Deed of Trust contains the following notation at the bottom left-hand corner of the first page: "Missouri – Second Mortgage."

Both loans closed concurrently on October 28, 2005. The Deed of Trust for the Loan was filed with the Jackson County Recorder of Deeds' Office on November 10, 2005.

**The challenged settlement charges.**

Capital Title Agency, Inc. provided title and closing services for the Loan. At closing Mr. and Mrs. Mayo signed a HUD-1 Settlement Statement supplied by Option One which identified "Option One Mortgage Corp." as the lender. The statement set out the following fees which Plaintiffs allege violate the Missouri Second Mortgage Loan Act:

Tax Service Contract fee to Fidelity National Tax Service                     $65.00
Funding Fee to Option One                                                     $50.00

4

| | |
|---|---|
| Underwriting Fee to Option One | $395.00 |
| Flood Search fee to First American Flood Data Services | $12.00 |
| Interest to Option One | $33.40 |
| Settlement or Closing Fee to Capital Title Agency, Inc. | $100.00 |
| Courier/Delivery Fee to Capital Title Agency, Inc. | $25.00 |
| Wire Fee to Capital Title Agency, Inc. | $20.00 |

These fees total $1,015.40 and were paid at closing by rolling the amounts owed into the Loan principal.

None of the Defendants *directly* contracted for, charged, or received any of these fees in connection with the making or closing of the Loan. None of the Defendants are, or ever have been, related to, controlled by, or affiliated by common ownership with Capital Title Agency, Inc., Fidelity National Tax Service, or First American Flood Data Services.

The "Funding Fee" and "Underwriting Fee" were paid to Option One.

Capital Title coordinated and performed all tasks associated with closing the Loan. Specifically, Capital Title compiled from various sources the loan documents needed for the closing, including the deed of trust and note. Capital Title also copied and transmitted documents to Option One and the Plaintiffs in connection with the Loan after the closing. It also filed the mortgage with the Jackson County Recorder of Deeds. Capital Title charged three fees for the services that it provided: It charged a $100 "settlement or closing fee" to conduct a title examination, issue title insurance, and prepare the settlement statement and other documents related to the Loan;[2] it charged

---

[2] Specifically, Capital Title gathered information about the property in order to determine whether title to the property was marketable. Capital Title also prepared a preliminary title commitment which it sent to Option One. After the conditions identified in the preliminary commitment were met, Capital Title ensured that the conditions imposed by the lender were also satisfied. Then, Capital Title completed the settlement statement and other documents related to the loan and prepared the disbursements to be made from the loan proceeds. Capital Title also assembled documents prepared by Option One and other service providers. Once the documents were ready, Capital Title scheduled the closing of the loan, met with the Mayos, and obtained signatures on the loan documents. Capital Title remitted copies of those documents to Option One immediately after the closing, so that the loan could be approved on the next day. Option One also made copies of those documents for the Mayos. Capital Title ensured that the holder of the first mortgage was notified of the second mortgage. Capital Title then updated its investigation

a $25 "courier/delivery fee" for collecting and sending documents necessary to conduct the title examination, prepare the title commitment, and record documents relating to the Loan;[3] and it charged a $20 "wire fee" for the cost of electronically disbursing the Loan proceeds.[4]

Option One paid out two of the other challenged fees to third-parties. It paid the $65.00 tax service contract fee to Fidelity National Tax Service for conducting a search to confirm payment of property taxes on the Plaintiffs' property. It also paid the $12.00 flood search fee to First American Flood Data Services for determining whether the house is located in a flood hazard area. Option One was not affiliated with either Fidelity National Tax Service or First American Flood Data Services.

A $33.40 pre-paid interest charge was imposed. Under the note, Mr. Mayo was required to make monthly payments to Option One of principal and interest, to be made on the 1st day of each month, with the first monthly payment for the month of November 2005 due on December 1, 2005. The note is dated October 28, 2005, and interest began accruing on that date. The $33.40 interest payment was payment on interest that accrued for the four days, from October 28, 2005 through October 31, 2005, until the first day of the month of the first regularly-scheduled payment.

---

of the encumbrances on the Mayos' property. Finally, Capital Title submitted the documents for the Loan to be recorded. This process, from the title examination to the recording of the new documents, required several hours to complete.

[3] Capital Title sent a courier to the Jackson County, Missouri courthouse to gather documents necessary to conduct the initial title examination. A second trip to the courthouse was made to verify that the initial title examination was still valid after the Loan closed. Capital Title also sent the preliminary title commitment to Option One by Federal Express. Finally, a courier took documents relating to the Loan to the courthouse to be recorded.

[4] Capital Title preferred to send payments by wire because it was a fast, reliable method. Option One wired the Loan proceeds to Capital Title, which deducted the fees described above, plus fees for title insurance and recording, and remitted the remaining proceeds by wire. Each time Capital Title received or sent a wire its bank charged it between $7.50 and $20.

**The Loan, post settlement.**

Option One held the Loan and acted as the servicer until about November 20, 2006. As loan servicer, Option One sent monthly statements and collected from the Plaintiffs remittances of principal and interest in connection with the Loan. Option One collected a minimum of $2,749.95 in interest payments during this time.

**UBS subsequently purchased the Loan.**

Defendant UBS Real Estate Securities, Inc. ("UBS") acquired the Loan and other loans from Option One pursuant to the terms of a Master Asset Purchase and Servicing Agreement dated August 1, 2004. On or about September 15, 2006, Option One sold a pool of 135 loans with a total principal balance of approximately $22.7 million to UBS for approximately $21.6 million. The Loan was included in this pool.

UBS contends it subjected these loans to a thorough due diligence process to determine their legality. There are numerous disputed questions of fact here about this process, including the mechanics of this process, its adequacy, and whether it was undertaken in good faith. The Court finds that viewing the evidence in the light most favorable to the Plaintiffs, there is evidence from which a reasonable juror could infer that UBS and any subsequent purchaser that relied on UBS's due diligence were completely indifferent to any violations of the MSMLA in purchasing the Loan.

**GMACM serviced the Loan from the time it was owned by UBS.**

In 2004, before UBS purchased the Loan, UBS and GMAC Mortgage Corporation ("GMAC Mortgage") entered into a servicing agreement whereby GMAC Mortgage agreed to service loans owned and acquired by UBS. GMAC Mortgage was the predecessor of Defendant GMACM, LLC ("GMACM"). GMACM was formed on April 13, 2006.

Pursuant to the terms of the servicing agreement, GMAC Mortgage and its successor GMACM serviced certain mortgage loans on behalf of UBS. The agreement confirmed that UBS was the "Owner" of the serviced loans and that GMAC Mortgage and its successor GMACM were merely the "Servicer." The agreement further provided that GMAC Mortgage and GMACM, as Servicer, "acknowledge[] that ownership of each Mortgage Loan, inclusive of the servicing rights thereto, is vested in the Owner." The parties agree that after UBS purchased the loan from Option One, the responsibility for performing the servicing of the loan was transferred to GMACM pursuant to the agreement. Under the agreement responsibility for servicing the loan did not confer on GMACM any rights to the loan, only the right to be paid a fee in exchange for performing activities related to servicing mortgage loans on behalf of UBS, the owner.

In connection with the transfer of loan servicing from Option One to GMACM, GMACM was provided with copies of certain documents from Option One, including the Note and Deed of Trust purchased by UBS. The original loan documents for the loan, such as the Note, Deed of Trust and any assignment, were held by the Custodian, Wells Fargo Bank, N.A. GMACM also received from Option One a copy of an "assignment in blank" (a blank assignment of the Deed of Trust), which Option One dated November 4, 2005. It is a standard practice in the residential mortgage loan servicing industry for the loan originator to provide the loan servicer with an "assignment in blank" so that the servicer can perform its servicing responsibilities, including assigning the loan to another servicer if needed or releasing the deed of trust once the loan is paid off.

GMACM serviced the Loan from the time UBS purchased it, approximately November 20, 2006, until the Loan was paid off and a Full Deed of Release of the Deed of Trust was recorded on or about April 8, 2008.

The core function of GMACM as the servicer was to collect from the borrower payments due on the loan, including interest. In collecting these payments pursuant to the Servicing Agreement, GMACM acted in a custodial capacity only and maintained a custodial account separate from its own assets and funds.[5] GMACM collected loan payments which included interest on the Loan only in its capacity as the Loan servicer. As part of its administrative responsibilities it also sent Mr. Mayo IRS form 1098 Mortgage Interest Statements forms for tax years 2006, 2007, and 2008 identifying "GMAC Mortgage" as the "Recipient/Lender."

**UBS subsequently sold the Loan to Mortgage Assets Securitization Transactions, Inc.**

In March 2007, UBS sold all its rights to the Loan to Mortgage Asset Securitization Transactions, Inc. Plaintiffs contend that Mortgage Asset Securitization Transactions, Inc. is merely a nominal owner.

Mortgage Asset Securitization Transactions, Inc., deposited the mortgage loans into a Trust designated as "MASTR Specialized Loan Trust 2007-01." The MASTR Trust was established as an express trust under the laws of New York pursuant to Section 2.08 of the Pooling and Servicing

---

[5] Pursuant to the terms of the Servicing Agreement, GMACM primarily performed the following activities related to the servicing of mortgage loans such as the loan at issue here:

    a) maintaining a servicing file, "in a custodial capacity only," of documents necessary to service each mortgage loan;

    b) delivering monthly statements or invoices to borrowers;

    c) collecting all payments due under each mortgage loan;

    d) segregating and holding all payments in "custodial accounts" apart from its own funds and general assets to be invested for the benefit of UBS;

    e) remitting to UBS all amounts in the custodial account and any monthly payments collected;

    f) segregating and holding all escrow funds in "escrow accounts" apart from its own funds and general assets for the payment of property taxes and insurance by borrowers;

    g) furnishing reports to UBS as required by the Servicing Agreement;

    h) ensuring timely payment of rents, taxes, assessments, water rates, insurance payments and other charges on each mortgage loan;

    i) ensuring maintenance of insurance;

    j) responding to borrower inquiries;

    k) counseling and working with delinquent borrowers; and

    l) supervising foreclosure and property dispositions.

Agreement ("PSA") dated as of March 1, 2007. The Trustee of the MASTR Trust is Defendant Deutsche Bank National Trust Company ("DBNTC").

**RFC then became the master servicer.**

Pursuant to the terms of the PSA and the related March 1, 2007 Assignment, Assumption and Recognition Agreement ("AARA"), Defendant Residential Funding Company, LLC ("RFC") acted as the Master Servicer/Trust Administrator for the pool of mortgage loans transferred to the MASTR Trust, including the Loan. As Master Servicer/Trust Administrator for the MASTR Trust, RFC primarily performed monitoring and reporting activities regarding the Trust's mortgage loans.[6] RFC acted on behalf of the MASTR Trust in performing these activities and reported to DBNTC, the Trustee, regarding its master servicing obligations.

RFC provides independent reporting, monitoring and cash flow reconciliation services for the benefit of the MASTR Trust and its certificate holders. In its capacity as trust administrator, RFC is responsible for preparing and delivering to DBNTC, the Trustee, a statement for the certificate investors and rating agencies setting forth details as to the distributions of collections to be made on each monthly distribution date, including amounts and order of priority of such distributions.

RFC did not directly collect or receive payments of principal or interest on the mortgage loans in the Trust. The payments of principal and interest were collected and received by the servicer, who then remitted these payments to RFC. Once RFC received the payments from the

---

[6] These monitoring and reporting activities included: a) receiving, reviewing and evaluating reports of remittances prepared by the servicer, GMACM, related to the mortgage loans; b) reconciling the results of its monitoring of GMACM's activities and, if necessary, coordinating corrective adjustments to the records; c) providing information to prepare periodic distribution reports for the holders of the certificates issued by the MASTR Trust and the rating agencies; and d) reconciling the result of its monitoring of collections on the mortgage loans with actual remittances of the servicer to the custodial account under the Servicing Agreement.

servicer, RFC placed the payments in a custodial account in the name of the DBNTC, the Trustee, for the benefit of the shareholders of the Trust (the "Custodial Account."). RFC then disbursed these funds to DBNTC, the Trustee.

The AARA did not confer on RFC any rights to the mortgage loans; rather, RFC contracted for and received only the right to be paid a fee to perform monitoring and reporting activities. RFC's fee for its work was paid out of interest earned on the Custodial Account. RFC did not directly charge, contract for, or receive any of the challenged fees allegedly charged, contracted for, or received prior to or at the closing of the Loan, nor did it have contact with Mr. or Mrs. Mayo with respect to the Loan. RFC never acquired by purchase, assignment, or any other means, any ownership interest in the Loan.

Neither GMACM nor RFC brokered or securitized the Loan. Neither GMACM nor RFC is or has been related to, controlled by, or affiliated with UBS, DBNTC or the MASTR Trust.

**GMACM continued to service the Loan until it was paid off in March 2008.**

The AARA designated GMACM as the loan servicer for the pool of mortgage loans transferred to the MASTR Trust, which included the Loan. GMACM's Servicing Agreement with UBS became subject to the terms of the AARA. The AARA did not purport to confer any rights to the mortgage loans on GMACM. With the exception of a few modifications pursuant to the AARA, there was no change in the activities performed by GMACM in servicing the mortgage loans transferred to the MASTR Trust. GMACM continued to collect mortgage payments from the borrowers. As noted earlier, GMACM serviced the Loan from approximately November 20, 2006, until the Loan was paid off on March 27, 2008.

The same day the loan was paid off GMACM sent a "Request for Release of Documents – Paid Off Loan" to Wells Fargo. In April 2008 GMACM stamped its name – "GMAC Mortgage LLC" – on the pre-dated blank assignment dated by Option One. GMACM did this in its designated role as the servicer and as a matter of administrative convenience to enable GMACM to promptly release the lien securing the discharged Loan. The assignment, although dated November 4, 2005, was not recorded with the Jackson County Recorder of Deeds Office until April 14, 2008. GMACM was identified as an assignee only of Mr. Mayo's Deed of Trust, not the Loan. Contemporaneous with the recording of this assignment, a Full Deed of Release of the Deed of Trust was recorded. It is dated April 8, 2008, and identifies the Grantor as "GMAC Mortgage, LLC."

At no time did GMACM ever acquire, by purchase, assignment, or any other means, any ownership interest in the Loan. When Mr. Mayo requested the identity of the owner of his loan pursuant to 15 U.S.C. § 1641(f)(2), GMACM identified the owner of the loan as UBS and/or the MASTR Trust.

**Discussion**

The sole count of the First Amended Complaint (doc. 32) alleges that each of the Defendants violated § 408.233.1 of the Missouri Second Mortgage Loan Act ("MSMLA") with respect to Plaintiffs' loans by "directly or indirectly charging, contracting for, and/or receiving" settlement charges not allowed, or in excess of what were allowed, under the MSMLA, or by receiving interest on loans which violated the MSMLA.

**I.    The MSMLA.**

The MSMLA is a "fairly comprehensive" consumer protection measure, enacted to protect Missouri homeowners by regulating "the business of making high-interest second mortgage loans on residential real estate." *U.S. Life Title Ins. Co. v. Brents*, 676 S.W.2d 839, 841 (Mo. App. 1984). The statute regulates the rates and terms of second mortgage loans, including the fees that may be charged, and "creates a private right of action for a person 'who suffers any loss of money or property as a result of' a violation of the Act." *Washington v. Countrywide Home Loans, Inc.*, No. 08-00459-CV-W-FJG, 2010 WL 199881, at *2 (W.D. Mo. Jan. 13, 2010) (Gaitan, J.) (quoting Mo. Rev. Stat. § 408.562.).

The MSMLA defines a "second mortgage loan" as

> a loan secured in whole or in part by a lien upon any interest in residential real estate created by a security instrument, including a mortgage, trust deed, or other similar instrument or document, which provides for interest to be calculated at the rate allowed by the provisions of section 408.232, which residential real estate is subject to one or more prior mortgage loans.

Mo. Rev. Stat. § 408.231.1 (2006).  In relevant part it provides that,

> 1.  No charge other than that permitted by section 408.232 shall be *directly or indirectly charged, contracted for or received* in connection with any *second mortgage loan*, except as provided in this

13

section:

(1) Fees and charges prescribed by law actually and necessarily paid to public officials for perfecting, releasing, or satisfying a security interest related to the second mortgage loan;

(2) Taxes;

(3) *Bona fide closing costs paid to third parties, which shall include*:

(a) Fees or premiums for title examination, title insurance, or similar purposes including survey;

(b) Fees for preparation of a deed, settlement statement, or other documents;

(c) Fees for notarizing deeds and other documents;

(d) Appraisal fees; and

(e) Fees for credit reports;

(4) Charges for insurance as described in subsection 2 of this section;

(5) A nonrefundable origination fee not to exceed five percent of the principal which may be used by the lender to reduce the rate on a second mortgage loan;

(6) Any amounts paid to the lender by any person, corporation or entity, other than the borrower, to reduce the rate on a second mortgage loan or to assist the borrower in qualifying for the loan;

(7) For revolving loans, an annual fee not to exceed fifty dollars may be assessed.

Mo. Rev. Stat. § 408.233.1 (2005) (emphasis added). However, the law also provides that § 408.233.1 "shall not apply to any transaction in which a single extension of credit is allocated between a first lien and any number of subordinate liens . . ." Mo. Rev. Stat. § 408.237 (2005).

The MSMLA also provides statutory remedies for violations. Section 408.236 states that,

14

> *Any person violating* the provisions of sections 408.231 to 408.241
> *shall be barred from recovery of any interest on the contract*, except
> where such violations occurred either:
>
> (1) As a result of an accidental and bona fide error of computation; or
>
> (2) As a result of any acts done or omitted in reliance on a written
> interpretation of the provisions of sections 408.231 to 408.241 by the
> division of finance.

Mo. Rev. Stat. § 408.236 (2005) (emphasis added). Additionally § 408.562 provides that,

> *In addition to any other civil remedies or penalties provided for by
> law*, *any person who suffers any loss of money* or property as a result
> of any act, method or practice in violation of the provisions of
> sections 408.100 to 408.561 *may bring an action in the circuit court .
> . . to recover actual damages*. The court may, in its discretion, award
> punitive damages and may award to the prevailing party in such
> action attorney's fees, based on the amount of time reasonably
> expended, and may provide such equitable relief as it deems
> necessary and proper.

Mo. Rev. Stat. § 408.562 (2005) (emphasis added).

## II.    Because Mrs. Mayo is not a party to the Loan, she lacks standing to sue Defendants.

As an initial matter the Court holds Mrs. Mayo lacks standing to bring any MSMLA claims

against Defendants because she was not a party to the Loan.

The doctrine of standing asks whether the litigant is entitled to have the court decide the

merits of the dispute. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). There are several

requirements for standing, some of which are constitutional, that is, derived from interpretation of

Article III, and some of which are prudential, meaning derived from the requirements of prudential

judicial administration. Erwin Chemerinsky, *Federal Jurisdiction*, §2.3.1, at 60-61 (5th ed. 2007).

To satisfy constitutional standing requirements the plaintiff must show (1) that the plaintiff

personally has suffered an actual or threatened injury ("injury-in-fact"); (2) that plaintiff's injuries

are traceable to the challenged action of the defendant and not some third party ("traceability"); and (3) that the court can redress that injury by the relief requested ("redressibility"). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Prudential limitations on standing (1) require the plaintiff to assert only his or her own rights, not the rights of third parties; (2) forbid a plaintiff from suing as a taxpayer who shares a grievance in common with all other taxpayers; and (3) require the plaintiff to be within the zone of interests protected by the statute in question. Chemerinsky, *Federal Jurisdiction*, §2.3.1, at 61. The burden of establishing standing lies with the plaintiff. *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000).

Mrs. Mayo does not have standing to sue under the MSMLA if she is not a party to the mortgage loan. *See HBC Auto Fin., Inc. v. Lyles*, 240 S.W.3d 736, 738 (Mo. Ct. App. 2007) (holding plaintiff who was not a party to, nor a third-party beneficiary, lacks standing to argue a loan agreement was invalid); c*f. Dash v. FirstPlus Home Loan Trust*, 248 F. Supp. 2d 489, 503 (M.D.N.C. 2003) (holding plaintiffs had standing to sue for violation of state lending law only assignees or purchasers of their loans, not other parties' loans). Otherwise Mrs. Mayo would not have suffered an injury-in-fact, she would simply be trying to assert someone else's rights—her husband's—and not her own.

And Mrs. Mayo is not, in fact, a party to the Loan. "A mortgage loan consists of a promissory note and security instrument, usually a mortgage or a deed of trust, which secures payment on the note by giving the lender the ability to foreclose on the property." *Bellistri v. Owen Loan Servicing, LLC*, 284 S.W.3d 619, 623 (Mo. Ct. App. 2009). A spouse is not a party to a mortgage loan if she signs the deed of trust but does not sign the promissory note. *Etheridge v. TierOne Bank*, 226 S.W.3d 127, 129 (Mo. 2007). Although Mrs. Mayo signed the Deed of Trust,

she did not sign the Note, thus she was not a party to the mortgage loan. The fact that she believed she was a party to the Loan and signed the documents she was requested to sign at closing does not alter the analysis. Consequently she does not have standing to sue.

## III. The funding fee and underwriting fee violate the MSMLA, but the other fees do not.

### A. The Loan is a "piggyback" loan, and the MSMLA applies to it.

Defendants' first argument is that the MSMLA does not apply to the Loan because it was a "piggyback loan" which was part of a single extension of credit, along with the first mortgage loan, to acquire the property. There is no merit to this argument.

A piggyback loan is a common financing option whereby two loans are made to the borrower to finance more than 80% of the purchase price of a home without paying private mortgage insurance. *See Rendler v. Corus Bank*, 272 F.3d 992, 996 (7th Cir. 2001). The first loan is typically made for 80% of the purchase price, and the second, or "piggyback," loan is a second-lien loan drawn to cover the down-payment requirement of the first-lien loan. *See Espinoza v. Recontrust Co., N.A.*, No. 09-CV-1687-IEG (RBB), 2010 WL 1568551, at *1 n.1 (S.D. Cal. April 19, 2010). The Loan at issue here, a second-lien loan which funded the 20% of the purchase price that the Wells Fargo loan did not, is a classic "piggyback" loan.

The Loan was not part of a single extension of credit. Although both the Option One and Wells Fargo loans closed concurrently as part of a single transaction to purchase the Mayos' home, there were two separate extensions of credit. This is evidenced by the fact that were two separate loans, an adjustable rate loan and a 30-year fixed loan, made by two different lending companies. For each loan there were separate notes and deeds of trust, separate HUD-1 settlement statements and loan disclosures, separate loan applications, separate loan underwriting processes, separate loan

17

approvals, separate credit checks, and separate title policies. There were also separate wire transfers funding the loans, separate verification of income and employment, and separate instructions to the closing agent. Mr. Mayo also gave Wells Fargo separate, formal notice as the first lien holder that he was giving Option One a second lien on the property.

Finding that there were two extensions of credit, the Court holds Defendants cannot invoke § 408.237 to prevent the MSMLA from applying to the Loan.

**B.     The funding fee and underwriting fee paid to Option One violated the MSMLA.**

Plaintiffs argue, and Defendants do not dispute, that the funding fee and underwriting fee paid to Option One violate the MSMLA. Defendants' argument, discussed below, is that *they* did not violate the MSMLA, thus they are not liable for any damages.

Whether or not the Defendants individually violated the MSMLA, it is clear that the funding fee and underwriting fees paid to Option One violated § 408.233.1(3) because they were not paid to third parties, nor they are permissible under any other subsection of § 408.233.1.

**C.     The other challenged fees are bona fide closing costs paid to third parties that are permitted under § 408.233.1(3).**

Defendants contend that five of the challenged fees (the tax contract service fee, the flood search fee, the settlement or closing fee, the courier/delivery fee, and the wire fee), are permitted under the MSMLA as "bona fide closing costs paid to third parties." Mo. Rev. Stat. § 408.233.1(3) (2005). They argue the statute's language allowing "bona fide closing costs paid to third parties, which shall include . . .," outlines categories of acceptable fees. *Id.*

Plaintiffs argue that the list of permissible "closing costs" set out in § 408.233.1(3) is a limited and exclusive one. If a particular fee does not appear among the statutory list, it is *per se*

illegal, and violates the MSMLA. Plaintiffs have withdrawn their allegation that the "Flood Search Fee" paid to First American Flood Data Services violates the MSMLA.[7]

**1.     "Which shall include" as used in § 408.233.1(3) is inclusive.**

A sister court in this district has previously held that the plain language of the statute "does not identify fees by a particular label or name; instead it provides for types or categories of fees that are permissible as bona fide closing costs for services that are required for the closing of a second mortgage loan." *Washington*, 2010 WL 199881 at *4 (quoting *Mitchell v. Beneficial Loan & Thrift Co.*, 463 F.3d 793, 795 (8th Cir. 2006)).  The question of whether the enumerated list in § 408.233.1(3) is exclusive was not before the court in *Washington*, but it is here.

In interpreting a state statute a federal court applies the state's rules of statutory construction. *Kansas State Bank in Holton v. Citizens Bank of Windsor*, 727 F.2d 1490, 1496 (8th Cir. 1984). Under Missouri law "courts have a duty to read statutes in their plain, ordinary and usual sense. Where there is no ambiguity, this Court does not apply any other rule of construction." *MC Dev. Co., LLC v. Cent. R-3 Sch. Dist. of St. Francis County*, 299 S.W.3d 600, 604 (Mo. 2009).  Where this is ambiguity, "[t]he primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute." *State ex rel. Burns v. Whittington*, 219 S.W.3d 224, 225 (Mo. 2007).

As a threshold matter the Court finds there is no ambiguity and that the plain and ordinary meaning of § 408.233.1(3) is that the enumerated fees are simply examples, not an exclusive list.

---

[7] In addition to arguing that the flood search fee was a bona fide closing cost paid to a third party, Defendants argued that the fee was authorized by federal law, and federal law preempts the MSMLA.  In response Plaintiffs initially argued that "none of the 5 fees Defendants' motions address (tax service contract, flood search, settlement or closing, courier/delivery and wire fees) appears among the authorized list of 'closing costs' in § 408.233.1(3). Hence, each should be deemed an illegal fee." Suggs. In Opp'n (doc. 192) at 172-73.  Two pages later, however, they concede the issue, stating they "withdraw their allegation that the flood certification fee violates the MSMLA." *Id.* at 174.

*Contra Mitchell v. Residential Funding Corp.*, --- S.W.3d ---, 2010 WL 4720755, at *12-13 (Mo. Ct.

App. Nov. 23, 2010) (holding the list is "deliberate and exclusive.")  As used in the statute this Court

finds that "which shall include" is inclusive.  This finding is confirmed by the controlling caselaw.

As the Missouri Supreme Court has observed, "[t]he meaning of the word 'include' may vary

according to its context.  Ordinarily it is not a word of limitation, but rather of enlargement."  *St.*

*Louis County v. State Highway Comm'n*, 409 S.W.2d 149, 153 (Mo. 1966).  In *St. Louis County*

voters had approved a bond issuance for "the construction of highways," "said highways to include

those commonly known as the Mark Twain and Daniel Boone Expressways and Ozark Expressway

with Route 61 connection, and an outer belt expressway running generally north and south and

connecting with highways and expressways running generally east and west" in the county, but the

bond proceeds were used on other highways in the county.  Overturning the trial court the Missouri

Supreme Court ruled the bond language did not prohibit the proceeds from being spent on other

highways in the county.  The Supreme Court held, "[w]hen used in connection with a number of

specified objects [the word 'include'] implies that there may be others which are not mentioned."

Similarly, in the present case, the Court reads "include" in § 408.233.1(3) as implying that there are

other permissible fees which are not mentioned.

This holding is consistent with the requirement that when reading a statute a court "is

required to give meaning to every word of the legislative enactment."  *State ex rel. SSM Health Care*

*St. Louis v. Neill*, 78 S.W.3d 140, 144 (Mo. 2002).  Limiting recoverable bona fide closing costs to

the enumerated fees would essentially write the words "which shall include" out of the statute.  If the

listed fees were meant to be the only permissible ones, the General Assembly would not have

inserted the phrase "which shall include" in the statute, it would have been superfluous and

unnecessary. The Court also notes the plain and ordinary use of the phrase "which shall include" is to alert the reader that the subsequently listed items are examples. Hence the only reading of § 408.233.1(3) which gives meaning to every word of it is to interpret "which shall include" inclusively.

Plaintiffs' contention, that the phrase "which shall include" is "irrefutably restrictive" and that there is "absolutely no reason" for the legislature to enumerate the five fees if it was not an exclusive set, ignores obvious reasons for listing the fees: It would be practically impossible for the General Assembly to envision every bona fide closing cost that could be paid to a third party and list it in the MSMLA, but a partial list illustrates what types of costs are allowed. Likewise there is no merit to the suggestion that reading the phrase inclusively will "truly blow apart" the statute and "permit a lender to assess any number of different, additional fees." Read inclusively the language still limits fees to bona fide closings costs paid to third parties. It prevents borrows from being charged any non bona fide fees, or fees that will directly or indirectly be paid to a lender.

Of course, reading § 408.233.1(3) inclusively is contrary to *Mitchell v. Residential Funding Corp.* 2010 WL 4720755, at *13 (holding the list is "deliberate and exclusive.")[8] In *Mitchell* the court acknowledged a previous decision in *State ex rel. Nixon v. Estes* that "include" is usually a term of enlargement, but held it had an exclusive meaning as used in § 408.233.1(3).[9] The court

---

[8] Plaintiffs' claim that "five (5) different judges in four (4) different cases" have reached a similar conclusion. This is an exaggeration. In several of the cited cases it is unclear whether the issues before the court were identical to those here, or what exactly the court's ruling was. That said, the rulings in *Schwartz v. Bann-Cor Mortgage*, No. 00CV226639, special master's report at 11 (Circuit Court of Jackson County, Mo. filed May 14, 2009) and *Mitchell v. Residential Funding Corporation*, No. O3CV2200489 (Circuit Court of Jackson County, Mo.) support Plaintiffs' position.

[9] *Mitchell* acknowledged that in *State ex rel. Nixon v. Estes* it held "[w]hile the plain meaning of the word 'include' may vary according to its context in a statute, it is ordinarily used as a term of enlargement, rather than a term of limitation." *Mitchell*, 2010 WL 4720755, at *13 (citing *State ex rel. Nixon v. Estes*, 108 S.W.3d 795, 800 (Mo. Ct. App. 2003). This portion of *Estes* cites *St. Louis County*, 409 S.W.2d at 152-153.

distinguished *Estes* on the grounds that the "contextual language" of § 408.233.1(3) was "quite different." *Mitchell*, 2010 WL 4720755, at *13. It opined that in *Estes* an inclusive use of "include" was needed to animate the legislature's intent, but an exclusive use was required under § 408.233.1(3) to effectuate the MSMLA's broad purpose as a consumer protection statute. *Id.*

The Court declines to follow this small portion of *Mitchell* for two reasons. First, while *Estes* may be distinguishable, *St. Louis County* is analogous, and because it is an analogous decision by the state's highest court its holding should control in interpreting § 408.233.1(3). Second, although this Court reads § 408.233.1(3) as unambiguously providing a non-exclusive list of fees, assuming for the sake of argument that the language is ambiguous, an inclusive reading best embraces the General Assembly's intent. The Court finds the MSMLA is a usury law. The General Assembly's intent was to prevent lenders who were already charging high-interest rates on second mortgage loans from also lining their pockets with fees for questionable services. *See Thomas v. U.S. Bank Nat. Ass'n ND*, 575 F.3d 794, 796 n.1 (8th Cir. 2009) ("The limits on closing costs and fee provided for in the MSMLA act as a trade-off for allowing lenders to charge a higher interest rate on second mortgage loans."). Section § 408.233.1(3) does this by preventing the imposition of anything other than bona fide closing costs paid to third parties. But interpreting the subsection exclusively, that is, as allowing fees for the bona fide closing costs explicitly mentioned, but not others, would be arbitrary and do nothing to advance the statute's purpose. A bone fide $25 "document preparation fee" paid to a third-party is no worse than a bone fide $25 "courier fee" paid to a third-party. Both are costs of business passed on to the consumer. Reading the language as allowing fees for any bona fide closing cost so long as it is paid to a third party best effectuates the statute's purpose.

Consequently the Court holds "which shall include" in § 408.233.1(3) should be read inclusively.

## 2. The four contested fees are bona fide closing cost paid to third-parties.

As discussed above § 408.233.1(3) permits a bona fide closing cost to be paid to a third party in connection with a second mortgage loan. A "bona fide [closing] cost is one that is 'paid to an unaffiliated third party for services actually performed.'" *Washington*, 2010 WL 199881 at *4 (quoting *Mitchell v. Beneficial Loan & Thrift Co.*, 463 F.3d 793, 795 (8th Cir. 2006)). Plaintiffs concede that the $12 flood search fee charged at closing was lawful. With respect to the four contested fees the record establishes that three of them, the tax service contract fee paid to Fidelity National Tax Service, and the courier/delivery and wire fees paid to Capital Title Agency, were paid to unaffiliated third parties for services actually performed, thus they do not violate the MSMLA.

Plaintiffs contest the legality of the remaining fee, arguing the $100 settlement or closing fee paid to Capital Title Agency was not bona fide. Plaintiffs note that under Missouri law it is illegal to charge or receive a document preparation fee unless a licensed attorney has prepared the deed and other legal documents, and that under federal law it is unlawful to assess a fee for completing a settlement statement, and Plaintiffs intimate that Capital Title Agency has violated these provisions.

The authority cited by Plaintiffs establishes that "escrow companies may not charge a separate fee for document preparation or vary their customary charges for closing services based upon whether documents are to be prepared in the transaction," *Eisel v. Midwest BankCentre*, 230 S.W.3d 335, 337 n.1 (Mo. 2007); that "charging a separate fee for the completion of legal forms by non-lawyers constitutes the unauthorized practice of law," *Carpenter v. Countrywide Home Loans,*

*Inc.*, 250 S.W.3d 697, 702 (Mo. 2008); and that federal regulations prohibit any lender or servicer from imposing a fee for the preparation of a settlement statement. While the record clearly demonstrates that Capital Title spent several hours conducting a title search and collecting and preparing various documents needed for closing, there is no evidence that it charged a separate fee or varied its customary charges for preparing legal documents, or that it was a lender or servicer under federal law such that it was prohibited from imposing a fee for the preparation of a settlement statement. Furthermore the MSMLA explicitly states that "fees for preparation of a deed, settlement statement, or other closing documents" are legal. Mo. Rev. Stat. § 408.233.1(3)(b) (2005). Consequently the charge was a bona fide closing cost paid to a third party. *See Washington*, 2010 WL 199881, at *4 (holding $60 fee paid to third party title company which compiled the loan documents needed for closing, including the mortgage and note, and performed other pre and post-closing tasks, was permissible under § 408.233.1(3)).

### D.    A pre-paid interest charge by itself does not violate the MSMLA.

Plaintiffs also contend that the pre-paid interest charge violates the MSMLA. Their argument is not that it is *per se* unlawful to charge pre-paid interest, but that once Option One violated § 408.233.1 by charging an illegal fee, Plaintiffs became entitled to recover all interest paid, including the prepaid interest, pursuant to §§ 408.236 and 408.562. The Court discusses Plaintiffs' argument below, but holds here that a pre-paid interest charge is not, by itself, a violation of the MSMLA.

**IV.** **Assignee Defendants UBS and DBNTC as trustee of the MASTR Trust are liable under the MSMLA, but loan servicers GMACM and RFC are not.**

Plaintiffs assert three theories of liability against Defendants. Plaintiffs contend that (1) because the money used to pay the illegal fees at closing was financed and rolled into the principal, Defendants received or collected a small amount of illegal fees each time a monthly payment was made on the Loan, thus Defendants *independently* violated the MSMLA by *indirectly* receiving illegal loan fees each month; (2) Defendants are *derivatively* liable as the originating lender's assignees under Missouri law, because by assuming the loans they assumed Option One's liability; and (3) Plaintiffs have a cause of action against DBNTC as trustee of the MASTR Trust and UBS (jointly "the Assignee Defendants") to recover interest paid on the Loan, because once Option One charged an illegal fee the loan became tainted so that assignees of the Loan were barred from collecting any interest on it.

**A.** **As post-closing, non-loan holder servicers, neither GMACM or RFC violated the MSMLA.**

As post-closing, non-loan holder servicers who did not have any ownership interest in the Loan such that they were entitled to any interest or principal from it, neither GMACM or RFC directly or indirectly charged, contracted for or received any illegal fees in violation of § 408.233.1(3), thus they cannot be liable as the Complaint alleges.

GMACM serviced the Loan after UBS purchased the Loan in November of 2006. As the servicer GMACM collected payments due on the Loan, but was acting in a custodial capacity only. GMACM maintained a custodial account for the payments separate from its own assets and did not retain any loan payments or interest. The Loan's various owners simply paid GMACM a fee to

25

perform administrative services related to collection and disbursement of the monthly payments.

RFC's relationship to the Loan is similar. After the MASTR Trust acquired the Loan RFC acted as the Master Servicer/Trust Administrator for the entire pool of mortgage loans transferred to the MASTR Trust, which including the Loan. As Master Servicer/Trust Administrator RFC primarily performed administrative and accounting functions for the Loan. RFC acted on behalf of the MASTR Trust in performing these activities and reported to DBNTC, the Trustee, regarding its master servicing obligations. RFC did collect or receive payments of principal or interest on the mortgage loans in trust, but received these payments from GMACM and placed them in a custodial account in the name of the DBNTC for the benefit of the Trust's shareholders. RFC was paid for its work as Master Servicer/Trust Administrator out of interest earned on the custodial account.

Neither GMACM nor RFC is related to, controlled by, or affiliated (other than its business relationships) with UBS, DBNTC or the MASTR Trust, and neither directly or indirectly charged, contracted for, or received any of the illegal fees imposed at the closing. Most importantly, unlike the Assignee Defendants, GMACM and RFC never acquired any ownership interest in the Loan such that they were entitled to the actual payments.

Performing administrative tasks related to the collection, accounting, and disbursement of monthly loan payments is completely different from charging, contracting for, or receiving an illegal fee imposed at closing. Nothing in the plain text of the MSMLA imposes liability on third-parties, such as loan servicers, who perform administrative tasks on loans.

Finally, the fact that GMACM was made an assignee on the deed of trust for administrative purposes is irrelevant. The assignment does not evidence that GMACM ever charged, contracted for, or received impermissible fees in any way, which is what liability is based on here. GMACM

received an assignment in blank so that GMACM could be made an assignee on the deed of trust for administrative purposes, that is, so it could more efficiently perform its servicing responsibilities by assigning the loan to another servicer or releasing the deed of trust once the loan had been paid off. Indeed, at the time the assignment in blank was apparently created, November 4, 2005, GMACM was not even in existence.

Accordingly the Court finds GMACM and RFC are entitled to summary judgment on all claims against them.

**B.      Assignee Defendants indirectly violated the MSMLA by virtue of the fact that illegal fees were rolled into the principal of the Loan at closing, and Defendants subsequently received these fees in monthly payments made on the Loan.**

Plaintiffs argue that because the money used to pay the illegal fees at closing was financed and rolled into the principal balance of the Loan, all Defendants received a small amount of these illegal fees every month as part of the monthly payment on the Loan, thus all Defendants violated the MSMLA by "indirectly" receiving illegal fees each time they received a monthly payment.

In response, Defendants contend that construing "indirectly charged" as encompassing financing payments on illegal fees charged at closing casts an absurdly wide net of liability. Defendants note that several courts have held for purposes of determining when a cause of action accrues under a statute of limitation that an illegal fee is charged once, at closing, not every time a payment is made. *Miller v. Pac. Shore Funding*, 92 Fed. App'x. 933, 937 (4th Cir. Jan. 28, 2004) (holding plaintiff's claims accrued at closing when he paid the disputed fees, even though the fees were paid by a promissory note); *Shepard v. Ocwen Fed. Bank, FSB*, 617 S.E.2d 61, 65 (N.C. Ct. App. 2005) (holding that although periodic payments were made toward the loan, the fee was paid at

closing, observing plaintiffs were not required to finance the loan origination fee, they could have paid it by cash, check, or credit card). Finally, Defendants contend that "indirectly charged" as used in § 408.233.1 means a fee charged in a misleading or deceitful way at closing, not a fee received at some later time by a downstream assignee who indirectly finances the closing costs.

The Court agrees that the MSMLA covers fees that are financed into the loan principal and then paid over time. *Mitchell*, 2010 WL 4720755 at *17 (holding that fees rolled into loan principal on which assignee defendants charged interest supports a finding that they indirectly charged an unauthorized fee). The text of the statute states "[n]o charge . . . shall be directly or indirectly charged, contracted for *or received . . .*" Mo. Rev. Stat. § 408-233.1 (2005) (emphasis added). The definition of "indirect" is "deviating from a direct line or course: not proceeding straight from one point to another: proceeding obliquely or circuitously: ROUNDABOUT." *Webster's Third New Int'l Dictionary* 1151 (1986) (capitalization in original). Here the Assignee Defendants indirectly received the illegal fees, albeit a very small amount of them, each time they received a monthly payment containing a repayment of fees that were rolled into the principal. Although interpreting "indirectly" as Defendants suggest is consistent with an alternate definition of the word, such an interpretation would produce an odd result: Participants in the secondary mortgage market could easily evade the law and launder an illegal loan by selling it immediately after closing. The Court finds that Option One charged or contracted for illegal fees at closing, and the Assignee Defendants indirectly received these fees at a later time as the loan payments were made, thus Assignee Defendants independently violated § 408-233.1.

**C.**     **Assignee Defendants are not derivatively liable under the MSMLA as Option One's assignees.**

Plaintiffs also claim Assignee Defendants are derivatively liable as the originating lender's assignees under Missouri law. Plaintiffs contend that they "stand in the shoes" of the assignor, Option One, and thus are derivatively liable for its MSMLA violations. There is no merit to this argument.

"Although an assignee is said to 'step into the shoes' of the assignor," this generally means "an assignee can acquire no greater right than the assignor held against the obligor." *Mitchell*, 2010 WL 4720755 at *20. But an assignment of the right to collect a debt does not mean "that the assignee is subject to all of an obligor's causes of action against the assignor." *Id.* Nothing in the MSMLA changed this aspect of the common law: "While a lender may be held liable for directly or 'indirectly' charging, contracting for, or receiving unlawful charges, 'indirect' still implies the lender's liability for its own actions, not those of the loan originator." *Id.*

Consequently the Court grants Defendants summary judgment on this theory of liability.

**D.**     **Whether Assignee Defendants are holders in due course is a disputed question of material fact.**

Related to their derivative liability theory Plaintiffs argue that § 408.236 "provides that interest is not allowed on violative second mortgage loans," and that "one who steps into the shoes of such a violator, must forego or forfeit and/or pay any interest paid and received on the illegal loan." Suggs. In Opp'n. at 157. Plaintiffs contend that regardless of whether Defendants independently violated the MSMLA, Option One violated it which tainted the Loan such that no interest could be charged on it, and this stain could not be laundered away by a subsequent

assignment.

Defendants argue that mortgage loans are negotiable instruments governed by Article 3 of the Missouri Commercial Code ("the UCC"),[10] that the UCC does not provide the obligor on a negotiable instrument the right to pursue claims against an assignee of the negotiable instrument for the statutory violations of the assignor, and that the UCC displaces any common-law rights here. Defendants' argument appears to be that since they are assignees, they are holders in due course entitled to the protection of the Holder in Due Course rule.

A mortgage loan is a promissory note and thus a negotiable instrument governed by the UCC. *Merz v. First Nat'l Bank of Franklin Cnty.*, 682 S.W.2d 500, 501-02 (Mo. Ct. App. 1984). A holder of an instrument, such as a promissory note, is a holder in due course if (1) the instrument when sold to the holder "did not bear such apparent evidence of forgery or alteration" or was not otherwise so incomplete as to call into questions its authenticity; and (2) the holder took the instrument under certain conditions, including taking the instrument "in good faith" and "without notice that any party has a defense or claim in recoupment described in Section 400.3-305(a)." Mo. Rev. Stat. § 400.3-302(a). The burden of proof is on the party seeking to establish that it is a holder in due course. *Transcon. Holding Ltd. v. First Banks, Inc.*, 299 S.W.3d 629, 660 (Mo. Ct. App. 2009). The benefit of being a holder in due course of a negotiable instrument is that such a holder takes free of any "personal" defenses or claims of the maker, such as lack of consideration, but not "real" defenses, such as the underlying transaction being illegal. *Id.* at 559; Mo. Rev. Stat. § 400-003.305 (2005). A holder in due course does not take free of any "real" defenses, such as the illegality of underlying transaction. *Transcon.*, 299 S.W.3d at 659; Mo. Rev. Stat. § 400-003.305

---

[10] Mo. Rev. Stat. §§ 400.1-101-400.4A-507 (2005).

(2005).

The Assignee Defendants are entities that subsequently purchased the promissory note on the Loan and so might be holders in due course. But given that there is a disputed question of material fact whether Assignee Defendants took the note in good faith or without notice of Plaintiffs' § 400.3-305 defense, the Court cannot determine at this time whether any Assignee Defendant is a holder in due course, and so cannot grant summary judgment on this theory of liability.[11]

## V.      Remedies

Defendants also seek summary judgment with respect to two remedies sought by Plaintiffs. Section 408.236 states that, "[a]ny person violating the provisions of sections 408.231 to 408.241 shall be barred from recovery of any interest on the contract." Mo. Rev. Stat. § 408.236 (2005). Section 408.562 provides that, "[i]n addition to any other civil remedies or penalties provided for by law, any person who suffers any loss of money or property as a result of any act, method or practice in violation of the provisions of sections 408.100 to 408.561 may bring an action in the circuit court . . . to recover actual damages." Mo. Rev. Stat. § 408.562 (2005). Section 408.562 also invests the court with discretion to award punitive damages, equitable relief, and attorney's fees.

### A.      Plaintiffs may sue for interest previously paid to Assignee Defendants.

Defendants move for summary judgment on Plaintiff's claim for the return of all interest paid on the Loan. Defendants note that the MSMLA bars entities that have violated the statute from "*recovery* of any interest on the contract." They argue that "recover" as used in § 408.236 means "to be successful in a suit, to collect or obtain amount," not "charge" or "collect." Defendants read §

---

[11] Interestingly, even if the Assignee Defendants are holders in due course, there is a question whether Mr. Mayo may have had a defense which as a matter of law extinguished any obligation  he had to repay any interest on the Loan. A "real" defense against a holder in due course includes the "illegality of the transaction which, under other law, nullifies the obligation of the obligor." Mo. Rev. Stat. § 400.3-305(a)(1)(ii) (2005).

408.236 as barring a violator from suing a borrower to recover interest, not authorizing a borrower to sue a violator for the return of interest previously paid. Plaintiffs argue that § 408.236, alone and together with § 408.562, authorize Plaintiffs to recover interest on the loan.

There are two possible meanings of "recovery" as used in § 408.236: (1) "The regaining or restoration of something lost or taken away;" and (2) "The obtainment of a right to something (esp. damages) by a judgment or decree." *Black's Law Dictionary* 1302 (8th ed. 2004). Both are equally plausible, so the Court cannot say that § 408.236 by itself creates a cause of action to recover interest previously paid on a loan. But reading § 408.236 in conjunction with § 408.562, which explicitly creates a cause of action to "recover" damages for a violation § 408.231.1, the Court finds that the plain meaning of the statute gives Plaintiffs a cause of action to recover interest paid to Assignee Defendants. Defendants motion is denied on this point.

**B.    Defendants are not entitled to summary judgment on punitive damages.**

Defendants also move for summary judgment on Plaintiffs' claims for punitive damages under § 408.236. Defendants contend that even at this stage of the litigation the record establishes that punitive damages should not be awarded here as a matter of law.

Under Missouri law,

> [a] punitive damages claim must be established with clear and convincing evidence. Clear and convincing evidence is evidence that "instantly tilts the scales in the affirmative when weighed against evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved." Evidence may be clear and convincing even if susceptible to different interpretations which may, or may not, clearly convince a reasonable juror.

*In re Genetically Modified Rice Litig.*, 666 F.Supp.2d 1004, 1030 (E.D. Mo. 2009). Viewing the evidence in the light most favorable to the Plaintiffs, there is evidence from which a reasonable juror

could infer that the Assignee Defendants may have been completely indifferent to the borrower's rights under the MSMLA. Accordingly Defendants have not shown they are entitled to summary judgment with respect to punitive damages at this time. Of course, whether plaintiffs will actually make a submissible case for punitive damages depends on the evidence presented at trial.

## Conclusion

The motions for summary judgment are GRANTED IN PART. The Court holds (1) Mrs. Mayo was not a party to the Loan thus she does not have standing to sue Defendants; (2) the funding fee and underwriting fee paid at closing to Option One both violate the MSMLA, but the other fees imposed do not; (3) the loan servicers are not liable, but the Assignee Defendants indirectly violated the MSMLA by virtue of the fact that illegal fees were rolled into the principal of the Loan at closing and they subsequently received these fees in monthly payments; (4) Mr. Mayo may sue for interest previously paid to the Assignee Defendants; and (5) Defendants are not entitled to summary judgment on the issue of punitive damages.

All claims against Defendants GMAC Mortgage, LLC and Residential Funding Company, LLC are dismissed with prejudice.

**IT IS SO ORDERED.**

DATE: <u>January 13, 2011</u>               <u>/s/ Greg Kays                    </u>
                                            GREG KAYS, JUDGE
                                            UNITED STATES DISTRICT COURT